REVISED OPINION
BARKDULL, Judge.
The genesis of this action, as ultimately tried in the trial court, was an alleged *1198 wrongfully issued order which had been agreed to by a party. We hold that one cannot agree to an order changing custody and control of two nursing homes (Hanover House and Towne House) to a government agency, Department of Health and Rehabilitative Services (HRS) and, thereafter, never make a complaint about the impact of the order and then sue and recover damages for its alleged wrongful issuance.
At the time HRS took possession of the two nursing homes, Portwood Care Centers, Inc. (“Portwood”) was the licensed nursing home operator. Portwood leased the nursing home buildings from appel-lee/counter-plaintiff, G & J Investments Corporation (“G & J”), which owned the land and the buildings, but was not the licensee.
On July 23, 1980, the attorney for Port-wood telephoned HRS and advised them that Portwood could no longer meet its financial obligations, and announced its immediate intention to abandon the operation of the two nursing homes, and its willingness to surrender its license.
After Portwood announced its impending insolvency, and HRS learned that the IRS had placed a tax lien on the nursing homes, HRS contacted Gerald Keller, principal stockholder of G & J, about keeping the facilities open because HRS needed the beds. Keller felt he could make the facilities more profitable. He had an accounting service which he wanted to handle the finances. He also had a trained administrator, one Ralph Stacey, whom he wanted to administrate the two homes. However, he was concerned with the Medicaid “related party” doctrine that prohibits a nursing home lessor from having too much control over a lessee-licensed operator. Keller expressed the desire to openly disclose the relationship between G & J, the accounting service, and Stacey, in some form of writing. A preliminary meeting was held between Keller, Stacey, G & J’s attorney, and HRS for the purpose of negotiating the “related party” issue. By the last Friday of July, 1980, a draft of an agreement was jointly prepared. Because of a question as to the licensure of Stacey, the agreement was not finalized until the following Monday when it was made clear that Stacey would have to submit an application for review, and that HRS would have to approve the application before Stacey could be licensed. The agreement was executed Tuesday, July 28, 1980. HRS and G & J were the only two parties to the agreement. Stacey Health Care Center, Inc., the proposed licensed operator, was not a party-
Within twenty-four hours of the time that HRS signed the agreement, the federal Medicaid office telephoned HRS regarding “major patient care deficiencies” at Hanover House, and announced its intention to cut-off federal aid because the facility was out of compliance with federal standards. HRS determined then to close Hanover House.
On August 1, 1980, HRS filed a complaint seeking declaratory relief and a temporary and permanent injunction under Chapter 400, Florida Statutes (1979). HRS recited Portwood’s announcement that it intended to abandon the facilities and surrender its license. HRS also detailed a number of problems within Hanover House, including a lack of hot water, a lack of adequate and permanent nursing staff, the inaccurate charting of medications, the unavailability of drinking water for bedridden patients, and poor housekeeping services. Stacey was not made a party to this action. He later admitted that he filed no application for licensure with HRS prior to June 1, 1981, and that he had not incorporated Stacey Health Care Centers, Inc. until 1982.
On August 15, 1980, the trial court signed an agreed order on HRS’s motion for emergency hearing. That order recited that the court placed a telephone conference call on an emergency basis to Port-wood’s attorney and G & J’s attorney, and that all counsel agreed to discuss the emergency petition by conference call. According to the agreed order, Portwood’s attorney stated “that he had no objection to plaintiff exercising complete possession and full control of Hanover House and Towne House nursing homes in order to *1199 insure the health, safety, and welfare of those patients residing therein”, and defendant G & J Investment Corporation, through its attorney, stated that G & J ... “would not object to Plaintiff taking custody, operating and control of the facilities upon assurances by the Plaintiff, that the Plaintiff would pay for rent from the time that the Plaintiff took possession and control.” By this order HRS took possession and control of the two nursing homes.
In October of 1980, G & J filed a motion to enjoin the abandonment of the Hanover premises by HRS. G & J insisted that the initial agreed order signed by the court did not authorize the abandonment of the nursing homes. G & J requested injunctive relief to maintain the status quo. HRS moved to strike G & J’s motion to enjoin the abandonment of the premises, responding that HRS acted under the valid statutory authority of Section 400.18, Florida Statutes, which upon a voluntary or involuntary discontinuance of the operation of a nursing home, permitted HRS to transfer the patients to insure the health, safety, and welfare of the patients. In addition, HRS pointed out that G & J had agreed to permit HRS to exercise possession of Hanover House, and that nothing in the agreed order required HRS to retain possession or control of the nursing home. On January 13, 1981, the trial court denied G & J’s motion to enjoin. G & J did not take an appeal from this order.
During the activity concerning the transfer of patients from Hanover House, the court and HRS were faced with the problem of the continued control of Towne House. HRS amended its complaint to request a receiver. During the receivership hearing the internal auditing coordinator for HRS testified that when he investigated the financial records of Portwood on August 1, 1980:
“The total corporate funds on hand on that date was a little less than $500.00 to run the two facilities. There was a food supply for about 5 days; roughly enough to get them over the weekend. General corporation reports accounting records were basically in shambles, bills were very much in arrears. They were threatening to cut off the lights, threatening to take the dishwasher out of the building.”
Another HRS witness testified that seventy to eighty percent of the air conditioners were not working throughout the mid-summer months. The trial court entered an order appointing a receiver that included factual findings based upon the aforementioned testimony and held:
“2. That the financial inability of Port-wood ... to provide food, shelter, care, and utilities to the patients residing in its facility threatened the health, safety, and welfare of these patients.
******
That plaintiffs [HRS] having remedied those conditions and having received no application from any source for a license to operate Towne House Nursing Home, have continued to operate the nursing home in order to insure the health, safety, and welfare of the patients, and should not be in the position of continuing to operate the nursing home facility indefinitively (sic).”
G & J never appealed this order.
During his tenure, the receiver vigorously complained about a unilateral attempt by G & J to raise the rent for Towne House, and requested that the court authorize the closure of the facility and the transfer of the patients. By order dated April 29, 1981, the trial court instructed the receiver to transfer the eighty remaining patients at Towne House. HRS repeatedly came forward to argue that transfer of these patients would not be in their best interest. HRS wanted a new licensee to take over the operation of Towne House. Both HRS and G & J’s attorney notified the court that Stacey had (finally) submitted an application in June of 1981 (almost a year after the August 15; 1980 agreed order), but the application had been sent back because it was incomplete. On the theory that Stacey might come in to run Towne House, the trial court temporarily stayed the order requiring transfer of the patients.
By July 27, 1981, the receiver indicated that twenty-two air conditioner units still required repair, and the facility still did not *1200 comply with a department rule designed to detect heat stroke. The receiver complained that because of reduced reimbursement rates, the result of a decrease in the number of patients, the receiver could not pay rent to G & J. The receiver stated that he:
“believed that his primary obligation was to see to the care and the safety of the patients, not to the owner of the facility, and therefore the receiver has expended $2,661.78 in repairing the air conditioning units which are the obligation of the landlord [G & J] to correct ...”
The court again instructed the receiver and HRS to take whatever action was necessary to place the remaining forty-two patients in other facilities within thirty days. HRS found that it could not comply with that order because of the lack of available nursing home beds and because the remaining twenty-nine patients were refusing to consent to the court ordered transfer. Meanwhile, a number of the remaining patients attempted to intervene in the case. After a hearing on September 4, 1981, the trial court denied the motion to intervene and ordered the receiver to continue to operate the facility until the remaining patients were transferred.[2] On September 18, 1981, the last patients in Towne House were transferred. On November 6, 1981, the court ordered G & J to meet with the receiver to accept the keys to the facility. In 1986, counsel for HRS filed a notice of voluntary dismissal of its complaint.
Counter-plaintiff, G & J, filed a second amended counter-claim which contained a count based on the theory of inverse condemnation; a count alleging the theory of a violation of equal protection; and a count alleging a breach of the July 28, 1980 agreement. The trial court granted a partial summary judgment in favor of HRS on the count alleging inverse condemnation. Counts II and III were submitted to the jury. G & J never alleged a count based upon wrongful injunction.
HRS raised numerous affirmative defenses. With respect to the contract claim, HRS defended on the basis that: (1) licen-sure was prerequisite to the operation and administration of the nursing home, and a condition precedent to HRS’ obligations under the agreement; (2) the proposed operator, Stacey Health Care, Inc. never applied for, nor obtained a license prior to the date that HRS filed its action; in fact, Stacey Health Care, Inc. was not ever incorporated at the time the “agreement” was signed; (3) the proposed operator, Stacey, was not a signatory to the "agreement,” nor was Stacey joined as a party; (4) no rental agreement was executed to bind HRS to payments of rent; (5) the so-called “agreement” itself was strewed with contingencies; (6) the cut-off of federal funds made the agreement impossible to perform, and (6) the agreement was void, as it violated public policy. HRS also raised the defense of sovereign immunity[3] and the defense *1201 that G & J was estopped from or waived any claims arising out of the possession and operation of the nursing homes or the transfer of the patients because G & J agreed to the August 15, 1980, order.
The case went to trial on the theory of breach of contract and violation of equal protection; the two remaining counts of the three count complaint. In opening argument, counter-plaintiff specifically identified these two counts and only these two counts. There was no mention of the theory of wrongful injunction.
On the fourth day of trial, over objection, the counter-plaintiff began to read from a series of sworn statements. At that time the court noted:
“I have looked over the counterclaim and we have had 95 percent of the testimony on the issues that are not even involved in this lawsuit.”
The attorney for HRS objected to the hearsay statements contained in the sworn statement and to the relevancy of the witnesses’ impressions. When the counter-plaintiff began to introduce other sworn statements, the court reiterated:
“THE COURT: What I said was there was three counts in the Counterclaim and all the other stuff is superfluous and does not have anything to do with those three items.
It is nice to get sympathy on our side, and that is what this is doing, but we will not have anymore of that testimony, except for inverse condemnation and denial of equal protection and breach of contract.”
Counter-plaintiff then announced for the first time a theory of wrongful injunction— which counter-plaintiff admitted was not in the pleadings. The court announced that it would permit the counter-plaintiff to put on testimony as to the theory of wrongful injunction. Ultimately, the issue of wrongful injunction was permitted to go to the jury. The jury found that G & J was wrongfully damaged in the amount of $1,000,000.00 as a result of the “injunction issued against it.” The jury found that HRS had breached its contract, but that the counter-plaintiff had not proved any damages, and the jury found no denial of equal protection.
HRS appealed the final judgment entered on the jury verdict, urging among other things that the trial court erred in permitting evidence of a wrongful injunction in connection with the entry of the agreed order, and the appellee cross-appealed urging error in the entry of the adverse summary judgment on the inverse condemnation count and in the failure of the trial court to enter a judgment notwithstanding the verdict or a new trial. In view of our ultimate holding in this case, the cross-appeal becomes moot.
It is generally held that one cannot participate in an inducement of error and then urge error in same as a basis for recovery. See and compare Cannon Sand & Rock, Inc. v. Maule Industries, Inc., 203 So.2d 636 (Fla. 3d DCA 1967); Union Trust Company v. Baker, 143 So.2d 565 (Fla. 2d DCA 1962); In re Fredcris Incorporated, 101 So.2d 49 (Fla. 3d DCA 1958). We find that the owner of the premises, G & J Investments Corporation, Inc., not only agreed to the original order (which it now contends was wrongfully issued) but never made a complaint in reference to said order or a motion to dissolve same. Under these circumstances we do not find that it had any cause of action as a result of the entry of said order.[4]
Wherefore, for the reasons above stated, the cause is returned to the trial court with directions to dismiss the counterclaim, with each party to bear its own cost.
Reversed and remanded with directions.

. By this date, HRS had accomplished, through a series of court orders, everything it had requested. In 1986 counsel for HRS, realizing that all relief sought had either been agreed to or adjudicated, dismissed the complaint as moot. The existence of the voluntary dismissal does not "prove" that the acts taken by HRS were wrongful — instead, the orders demonstrate that by September of 1981 the relief sought had been gained. As discussed in Oakwood Manor, Inc. v. Eck, 358 So.2d 585 (Fla. 2d DCA 1978): "Obviously, there may be circumstances under which a temporary injunction is properly obtained, but because it has accomplished its purpose, or due to changed conditions beyond the control of the plaintiff, the injunction is later dissolved as moot. Thus in Scott v. Frank, 121 Iowa 218, 96 N.W. 764, 765 (1903) the court said: To sustain an action for damages it must be made to appear that such an injunction was wrongful in its inception, or at least was continued owing to some wrong on the part of plaintiff. If rightfully awarded, but afterwards properly dissolved because of matters done or arising subsequent to its issuance, there can be no recovery of damages.’ See also M. Blatt Co. v. Southwell, 259 N.C. 468, 130 S.E.2d 859 (1963); Mengel Co. v. International Woodworkers of America, 220 Miss. 317, 70 So.2d 613 (1954).”

. While it is not necessary to disposition of this case, we recognize that the allegations of HRS to the effect that sovereign immunity is a defense to the instant action and that the trial court erred in permitting G & J to amend its counterclaim during midtrial to state a new cause of action, may in fact be meritorious. See City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla.1985); Trianon Park Condominium Association, Inc. v. City of Hialeah, 468 So.2d 912 (Fla.1985); Designers Tile International Corporation v. Capitol C. Corporation, 499 So.2d 4 (Fla. *1201 3d DCA 1987); Lasar Manufacturing Company, Inc. v. Backanov, 436 So.2d 236 (Fla. 3d DCA 1983); compare the exception announced in Pan Am Tobacco Corporation v. Department of Corrections, 471 So.2d 4 (Fla.1985).

. We also have serious doubt if G & J Investment Corporation, Inc. has any standing to complain of a license revocation pursuant to Section 400.121, Florida Statutes (1979) when the license was never in its name.